FILED TD
6/29/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint          AUSA Sushma Raju (312) 353-5329

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JOSUE PACHECO TORRES,
KLEIVER MONASTERIO BRICENO,
          also known   as "Goofy," and
JULIAN PACHANO

CASE NUMBER: 26 CR 345

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 18, 2026, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| Title 18, United States Code, Sections 1201(a) and (c) | Kidnapping resulting in death and kidnapping conspiracy |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*TFO Kevin Hawkins*

KEVIN HAWKINS
Task Force Officer, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: June 29, 2026

*Laura K. McNally*
boxSIGN
*Judge's signature*

City and state: Chicago, Illinois

LAURA K. MCNALLY, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT )
                             )
NORTHERN DISTRICT OF ILLINOIS )

**AFFIDAVIT**

I, Kevin Hawkins, being duly sworn, state as follows:

1.     I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"). I have been so employed since approximately October of 2025. I was previously a TFO with the Federal Bureau of Investigations in 2017.

2.     As part of my duties as an FBI TFO, I investigate criminal violations relating to violent crimes, including, among others, murders, kidnapping, bank robbery, and the apprehension of violent fugitives. I have been a police officer with the Chicago Police Department ("CPD") for over 13 years and a detective since 2018. I am currently assigned to the Chicago Police Department's Bureau of Detectives, Area Four Homicide. During my time as a CPD officer and detective, I have investigated numerous crimes including homicides, other violent crimes, narcotic offenses, and illegal gun trafficking.

3.     This affidavit is submitted in support of a criminal complaint alleging that KLEIVER MONASTERIO BRICENO, a/k/a "Goofy," JOSUE PACHECO TORRES, a/k/a "Popeye," JULIAN PACHANO, and others known and unknown violated Title 18, United States Code, Sections 1201 (a) and (c). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging KLEIVER MONASTERIO BRICENO, a/k/a "Goofy," JOSUE PACHECO TORRES, a/k/a "Popeye," and JULIAN PACHANO with

kidnapping resulting in death and conspiracy to commit kidnapping, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

4.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and circumstances described herein, interviews of a confidential source and witnesses, and review of video surveillance images, and surveillance footage.

## I.     FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT DEVICE

### A.     Introduction and Summary

5.     Since in or about 2024, law enforcement officers with the CPD, FBI, and Homeland Security Investigations ("HSI") have been investigating acts of violence, including murders and shootings, involving suspected members of Tren De Aragua ("TDA") and its splinter faction Anti-Tren.

6.     Based on my training and experience, my review of publicly available social media accounts, my interviews of current and former self-identified TDA and Anti-Tren members and my discussions with other law enforcement officers who have conducted such interviews, and my personal surveillance of individuals identified by witnesses as, or otherwise believed to be TDA or Anti-Tren members, I have learned the following: (a) TDA is a violent transnational gang and, since February 2025, a designated foreign terrorist organization, originating in Venezuela, that has

2

established a substantial foothold in the United States, including in and around Chicago, Illinois; (b) there are substantial intra-gang conflicts within TDA and, in some cases, TDA members have disavowed the gang and described themselves as "Anti-Tren" while continuing to associate and commit crimes with each other; (c) a gang member's self-identification as TDA or "Anti-Tren" can be fluid and the same gang member may switch between the two affiliations depending on time and context; (d) TDA/Anti-Tren members in and around Chicago have engaged in numerous acts of violence, including murders and shootings, as well as sex trafficking and drug trafficking, in connection with their membership in TDA and Anti-Tren.

7.     As set forth in greater detail below, on or about May 19, 2026, police officers discovered the body of a deceased male (the "Victim") inside an abandoned apartment building in Chicago, Illinois. The Victim had been shot and killed after he had been kidnapped on or about May 18, 2026. For the reasons set forth below, there is probable cause to believe that KLEIVER MONASTERIO BRICENO, a/k/a "Goofy" or "Gufi," JOSUE PACHECO TORRES, a/k/a "Popeye," JULIAN PACHANO, and others known and unknown participated in a conspiracy to kidnap and ultimately kill the Victim, in connection with their involvement in TDA.[1]

---

[1] Based on immigration records, MONASTERIO BRICENO, PACHECO TORRES, and PACHANO are believed to be Venezuelan nationals.

3

**B.      The May 18, 2026 Kidnapping and Murder of the Victim**

8.      Based on my review of law enforcement records, my discussions with other law enforcement officers, my interviews of the witnesses described below,[2] and my involvement with this investigation, I have learned, among other things, the following:

a.      On or about May 19, 2026, at approximately 9:15 PM, the Victim's mother (the "Mother") contacted CPD police officers and requested a wellness check at the apartment building located at 6829 South Perry Avenue (the "Perry Apartment"). The Mother told CPD officers, in substance, that she had been directed to the Perry Apartment by an individual with whom the Mother had been communicating via WhatsApp.

b.      At approximately 9:53 PM, CPD officers entered the Perry Apartment and found the Victim's lifeless body inside the bathroom of an abandoned unit in the Perry Apartment. The Victim, who was wearing a red hooded sweatshirt and black Adidas track pants, was facedown and partially in a bathtub, and his hands were bound behind his back. A medical examiner later concluded that the Victim had been shot multiple times in the face, head, and body and that he had suffered blunt

---

[2] The witness described below speak primarily or exclusively Spanish and my understanding of the substance of their statements is based, in substantial part, on the assistance of Spanish-speaking law enforcement officers who have participated in the same interviews. In one or more early witness interviews, I relied, in part, on commercially available language-translation software. When that has been the case, I have later sought to confirm or clarify the substance of the witness statements with the assistance of Spanish-speaking law enforcement officers.

force injuries to his head, face, arms, neck, hands, and torso. According to CPD records, CPD officers found multiple shell casings and fired bullets in Unit 1W.

c. Following the discovery of the Victim's body, CPD officers interviewed the Mother, as well as two individuals who were with the Victim at the time the Victim was kidnapped ("Witness-A" and "Witness-B"), both of whom knew the Victim.

9. Based on my review of CPD reports and my discussions with other law enforcement officers, including a law enforcement officer who interviewed Witness-A, I have learned that Witness-A has told law enforcement, in substance and in part, the following:[3]

a. On or about May 18, 2026, at approximately 3:00 PM, the Victim, Witness-A, and Witness-B were walking together at Meyering Park, near the intersection of 71st Street and Martin Luther King Drive in Chicago, Illinois. Witness-A was walking a short distance behind the Victim and Witness-B.

b. Witness-A saw a silver SUV (the "Silver SUV") drive southbound on Calumet Avenue from 71st Street. The Silver SUV stopped near the Victim and the rear driver-side door opened. Seated in the rear driver-side seat was a Hispanic male ("Coconspirator 1") who Witness-A recognized and knew by a nickname.

---

[3] Witness-A does not have lawful immigration status to be present in the United States. Based on CPD records and my conversations with officers who have interviewed Witness-A, Witness-A has not been provided any benefit in exchange for providing information to law enforcement.

Coconspirator 1 was wearing a dark T-shirt and a dark baseball cap. Just as the Silver SUV stopped in front of the Victim, another male (the "Running Male"), who Witness-A did not recognize, ran southbound down Calumet Avenue. The Running Male was wearing a red hat. The Running Male and the Victim both entered the Silver SUV, which continued southbound at a high rate of speed.

c. On or about May 25, 2026, CPD officers showed Witness-A a photo array, and Witness-A identified Coconspirator 1 as the person Witness-A knows and who was seated in the rear of the Silver SUV.

10. Based on my review of CPD reports and my discussions with other law enforcement officers, including a law enforcement officer who interviewed Witness-B, I have learned that Witness-B has told law enforcement, in substance and in part, the following:[4]

a. On or about May 18, 2026, at approximately 3:00 PM, the Victim, Witness-A, and Witness-B were walking together at Meyering Park, near the intersection of 71st Street and Martin Luther King Drive in Chicago, Illinois. They were walking toward their vehicle, which was parked near 7149 Calumet Avenue. Witness-B was walking slightly behind the Victim, and Witness-A was walking behind them.

---

[4] Witness-B has pending state firearms charges and does not have lawful immigration status to be present in the United States. Based on CPD records and my conversations with officers who have interviewed Witness-B, Witness-B has not been provided any benefit in exchange for providing information to law enforcement.

b.     Witness-B saw the Running Male, who Witness-B did not recognize, running southbound on Calumet Avenue while yelling. The Running Male appeared to be holding a pistol in his hand as he approached the Victim. The Running Male then pushed the Victim into the Silver SUV, which traveled southbound on Calumet Avenue at a high rate of speed.

11.     Based on my review of CPD reports and my interviews of the Mother, the Mother[5] has told law enforcement, in substance and in part, the following:

a.     On or about May 18, 2026, the Mother contacted a WhatsApp user who was using a number with a Venezuelan country code, with the hope of obtaining information about the Victim's whereabouts.[6] The Mother believed this user (the "WhatsApp User") to be a member of TDA. The WhatsApp User told the Mother, in substance and in part: (i) that the WhatsApp User believed Coconspirator 1 and "Popeye" to be involved in Victim's kidnapping and (ii) that the Victim was being targeted because he was believed to have committed a murder.

b.     On or about May 19, 2026, after the Mother arrived in Chicago, she sought additional information about Victim's location from the WhatsApp User, who directed her to the Perry Apartment. Thereafter, the Mother contacted CPD, who

---

[5] The Mother does not have lawful immigration status to be present in the United States. Based on CPD records and my conversations with officers who have interviewed the Mother, the Mother has not been provided any benefit in exchange for providing information to law enforcement.

[6] Based on my experience and training, a country code is a short combination of numbers used to uniquely identify a specific country and dialed when making international phone calls.

7

discovered the Victim's body in the abandoned unit in the Perry Apartment, as described above.

12. Based on my review of law enforcement reports and my discussions with other law enforcement officers, as well as my review of the video surveillance and other evidence described below, I have learned, among other things, the following:

a. Video footage from a building near the park, Police Observation Devices ("POD"), National Vehicle Location Service ("NVLS"), and License Plate Reader ("LPR")[7] cameras show a silver Dodge Durango (the "Durango") bearing Illinois license plate GB81159 with tinted windows traveled at a high rate of speed southbound down Calumet Ave at approximately 3:00 PM. Based on POD, NVLS, and LPR data, the Durango traveled south on Calumet Avenue. Based on the description of the Silver SUV provided by Witness-A and Witness-B, and the time and direction of travel, I believe that the Durango is the Silver SUV—that is, the vehicle that Witness-A and Witness-B saw the Victim entering.

---

[7] Based on my training and experience: (a) a POD (Police Observations Device) is a pole-mounted street camera, deployed across the city to deter crime, monitor public spaces and aid law enforcement investigations, (b) an LPR (License Plate Reader) is a system that combines high resolution cameras with software that automatically reads and records license plates, deployed across the city to aid law enforcement investigations, and (c) NVLS (National Vehicle Location Service) is a database of license plate readers that collect vehicle license plates with the date/time and are associated with a location, usually accompanied with a photo. These systems are affixed to but not limited to: police cruisers, fixed cameras, and commercial vehicles.

13.     Based on my review of external surveillance video footage showing the exterior of the apartment building located at 6004 S. Archer Road (the "Archer Apartment"), Chicago, Illinois, I have learned, among other things, the following:

a.      At approximately 3:54 PM, the Durango pulled into a parking lot adjacent to the Archer Apartment. At approximately 3:55 PM, a Hispanic male wearing a white T-shirt, black shorts, and a black ankle monitor on his left ankle ("Male-1") exited the Archer Apartment and walked toward the Durango, as shown below. I believe Male-1 was JOSUE PACHECO TORRES, a/k/a "Popeye," for the following reasons: (i) Male-1 was wearing a location-monitoring ankle bracelet, and I know from speaking with a law enforcement officer who is familiar with PACHECO TORRES's criminal history that, on or about February 17, 2026, a location monitoring ankle bracelet was fitted on PACHECO TORRES as a condition of his pretrial release in a criminal prosecution pending in the Circuit Court of Cook County, Illinois; (ii) Male-1 resembles known law enforcement photographs of PACHECO TORRES, as shown below, and (iii) I have seen PACHECO TORRES in person, in connection with court proceedings, on or about February 17, 2026, and again on or about May 27, 2026. As discussed below, a confidential source also identified Male-1 to be PACHECO TORRES.

9



(Male-1, identified to be PACHECO TORRES at approximately 3:55 PM (left) and
approximately 6:37 PM (right))



(PACHECO TORRES)

10

b.     As PACHECO TORRES walked to the Durango, as described above, he was in the company of another Hispanic man ("Male-2"), who was wearing a dark hooded sweatshirt and light blue shorts. Based on my comparison of video surveillance of Male-2, including at points later in the surveillance recording, with known law enforcement photographs of KLEIVER MONASTERIO BRICENO, a/k/a "Goofy," I believe that Male-2 was MONASTERIO BRICENO, as shown below. Based on a law enforcement database photograph of MONASTERIO BRICENO's left hand, I know that MONASTERIO BRICENO has a Guy Fawkes tattoo on the back of his left hand. As discussed below, a confidential source also identified Male-2 to be MONASTERIO BRICENO.

11



(Male-2, identified to be MONASTERIO BRICENO, at 3:55 PM (left) and 6:37 PM (right))



(MONASTERIO BRICENO)

c.    PACHECO TORRES and MONASTERIO BRICENO approached the Durango and opened the rear driver side door.

d.    Another Hispanic male wearing a black-and-white jacket, light jeans, and a red baseball cap ("Male-3") exited the Durango, as shown below. Male-3 kept his right hand inside the front pocket of his jacket, as though holding an object, while his left hand was exposed and visible. Male-3's red baseball cap matched Witness-A's description of the Running Male as wearing a red hat, and Male-3 emerged from the rear of the Durango, where both Witness-A and Witness-B saw the Running Male enter. Accordingly, I believe that Male-3 was the Running Male—i.e.,

13

the person that both witnesses saw run down the street when the Victim was kidnapped in the vicinity of Meyering Park.

e.      Based on my comparison of video surveillance of Male-3, including at points later in the surveillance recording, with known law enforcement photographs of JULIAN PACHANO, I believe that Male-3 was PACHANO, as shown below, and that PACHANO was the Running Male—i.e., the man whom Witness-A and Witness-B both saw running toward the Victim when the Victim was kidnapped near Meyering Park. As discussed below, a confidential source also identified Male-3 from a known photograph of PACHANO.

14



(Male-3, identified to be JULIAN PACHANO, at approximately 3:55 PM (left) and approximately 6:09 PM (middle and right).)



(PACHANO)

15

f.      After PACHANO exited the Durango, the Victim exited the Durango. The Victim was shirtless and was wearing black Adidas track pants with white stripes, and black-and-white Jordan gym shoes. PACHECO TORRES grabbed the Victim by the back of his arms and forcibly escorted him toward the Archer Apartment, leaving the rear driver door open. PACHANO followed. A still image showing the Victim, PACHECO TORRES, and PACHANO appears below.



(Left to right: PACHANO, PACHECO TORRES, and the Victim.)

g.      Thereafter, two other Hispanic males exited the Durango. One of these males ("Male-4"), the driver of the Durango, was wearing a black T-shirt and

16

black pants. In subsequent footage, at approximately 6:09 PM, Male-4's foot attire—black flip-flops with a bright red-orange strap—is also visible. Based on my comparison of video surveillance of Male-4, including at points later in the surveillance recording, with known law enforcement photographs of an individual known to law enforcement ("Coconspirator 2") I believe that Male-4 was Coconspirator 2.

h. The other Hispanic male, who emerged from the rear driver-side seat, was wearing a black T-shirt, black hat, and gray pants. This description of the clothing worn by Coconspirator 1 matched the description of the male that Witness-A provided.

a. At approximately 3:56 PM, MONASTERIO BRICENO, Coconspirator 1, and Coconspirator 2 followed PACHECO TORRES, PACHANO, and the Victim toward the Archer Apartment. Approximately two minutes later, at 3:58 PM, Coconspirator 1 returned to the Durango and opened the driver and rear driver-side doors, appearing to look for something, before returning to the Archer Apartment.

b. At approximately 4:30 PM, a blue Toyota Camry with license plate GB96237 (the "Camry") turned into the same parking lot where the Durango was parked. The driver of the Camry—a Hispanic male wearing a white hooded sweatshirt, jeans with red rear pockets, and all-black flip-flops ("Male-6")—exited.

17

c. Male-6 was met in the parking lot by another Hispanic male ("Male-7") who was wearing a baseball cap, a white printed T-shirt, dark shorts, and a shoulder bag and who appeared to have exited the Archer Apartment and who accompanied Male-6 back to the Archer Apartment.

d. At approximately 6:09 PM, Coconspirator 2 (wearing the same clothing as before), PACHANO (wearing the same clothing and red baseball cap as before, but no longer wearing the black-and-white outer jacket), and Male-7 (wearing the same clothing as before) walked from the Archer Apartment to the Camry and entered the Camry, as shown below. Coconspirator 2 entered the driver seat, PACHANO entered the front passenger seat, and Male-7 entered the rear driver-side seat.



(Left to right: Coconspirator 2, Male-7, and PACHANO)

18

e.    At approximately 6:11 PM, the Camry exited the parking lot. At approximately 6:27 PM, the Camry returned to the parking lot, and Coconspirator 2, PACHANO, and Male-7 exited, this time with PACHANO as the driver. Coconspirator 2 appeared to be holding an orange bottle of liquid. PACHANO and Male-7 walked back toward the Archer Apartment, while Coconspirator 2 entered the Durango and then circled to the front of the Durango and opened the hood. After a period of time obstructed by the hood of the Durango, Coconspirator 2 emerged with the orange bottle, which now appeared to be empty and which he kicked away from the Durango. Coconspirator 2 then returned to the direction of the Archer Apartment.

f.    At approximately 6:37 PM, PACHECO TORRES, MONASTERIO BRICENO, and the Victim exited the Archer Apartment and walked toward the Camry. PACHECO TORRES's hands were placed on the Victim's shoulders, and the Victim's wrists were bound together behind his back. PACHECO TORRES then placed the Victim in the backseat of the Camry.

19



(Left: PACHECO-TORRES, in white, escorting the Victim, wearing a red hooded sweatshirt, to the Camry; MONASTERIO BRICENO, in blue shorts, walking toward the Camry at the same time. Right: PACHECO-TORRES placing the Victim, whose hands are bound behind his back, in the backseat of the Camry.)

g.      Closely following them was Coconspirator 1, now wearing shorts instead of long pants, but otherwise wearing the same clothing as before. Shortly thereafter, PACHANO (wearing the same clothing as before) and Coconspirator 2, now wearing a red-hooded sweatshirt over his prior attire, emerged from the Archer Apartment and similarly walked toward the Camry.

20



(Left to right: Victim, PACHECO TORRES, and Coconspirator 1)



(PACHANO)

  h.  MONASTERIO BRICENO entered the driver seat of the Camry. Coconspirator 1 entered the rear driver side seat. PACHANO entered the front passenger seat. Coconspirator 2 entered the rear passenger seat next to the Victim. At approximately 6:37 PM, the Camry left the parking lot, and PACHECO TORRES returned to the Archer Apartment. As PACHECO TORRES walked toward the

22

Archer Apartment, PACHECO TORRES appeared to exchange greetings with Male-7 and Male-6. As they passed each other, PACHECO TORRES fist-bumped Male-6.



(Left to right: Male-7, Male-6, PACHECO TORRES.)

14.     During the investigation, I and other law enforcement officers reviewed surveillance footage outside of the Perry Apartment.[8] The following events took place after the Camry left the Archer Apartment and traveled to the Perry apartment:

        a.      At approximately 6:58 PM, the Camry approaches the back of the Perry Apartment in an alleyway. At approximately 6:59 PM, the Camry pulls close to an entrance to the Perry Apartment. At approximately 7:00 PM, four individuals exit the car. Two individuals appear to be wearing red hoodies, consistent with the clothing worn by the Victim and Male 4. The two other individuals are wearing dark-

---

[8] Based on comparison to nearby POD camera video, the private video showing the outside of the Perry Apartment appears to have a timestamp that is approximately 44 minutes behind the actual time. The times noted with regard to this private video have been adjusted accordingly to reflect the actual time.

colored clothing with white patterns, consistent with the clothing worn by PACHANO and Coconspirator 1 at the time they left the Archer Apartment. The Victim, Male 4, PACHANO, and Coconspirator 1 then entered the building in which the Perry Apartment is located.

b.      At approximately 7:01 PM, the Camry pulls a short distance away from the Perry Apartment and parks out of sight. The driver of the Camry, who appears to be wearing a dark colored sweatshirt, a white undershirt, and light blue shorts, then enters the Perry Apartment. The driver's clothing is consistent with the clothing worn by MONASTERIO BRICENO at the time he left the Archer Apartment, driving the Camry.

c.      At approximately 7:07 PM, PACHANO, Coconspirator 1, Coconspirator 2 exited the Perry Apartment, followed closely by MONASTERIO BRICENO. The Victim did not exit the building with the group. Moments later, the Camry reappears in the video and drives away down the alley.

15.     At approximately 7:40 PM, the Camry returned to Archer Apartment's parking lot where the previous occupants described above, except the Victim, exited the Camry and entered the Archer Apartment. After the occupants returned to the Archer Apartment, law enforcement did not observe the Victim in any subsequent surveillance video.

**C.      Information Provided by CHS**

16.     During the investigation, I and other law enforcement officers have interviewed a confidential source ("CHS"). Based on my participation in interviews of

24

CHS,[9] and my discussions with other law enforcement officers who conducted such interviews, I have learned, among other things, the following:

a. As detailed further below, CHS was physically present when the individuals responsible for kidnapping and murdering the Victim discussed their plans. Those individuals included individuals whom CHS knew as "Goofy," "Popeye," and other individuals.

b. CHS provided to law enforcement a social media page of the individual CHS knew as "Goofy." Based on my comparison of the profile picture posted on that social media page and a known law enforcement photograph of MONASTERIO BRICENO, I believe that MONASTERIO BRICENO is the individual CHS knew as "Goofy."

c. On or about May 27, 2026, a law enforcement officer showed CHS portions of the video surveillance, described above, depicting individuals in and around the parking lot adjoining the Archer Apartment on May 18, 2026. CHS identified the Victim as an individual CHS knew as by Victim's first name, Male-1 as an individual CHS knew as "Popeye" and Male-2 as an individual CHS knew as "Goofy."

---

[9] Beginning in approximately November 2025, CHS began cooperating with law enforcement. CHS does not have lawful immigration status in the United States and CHS is providing information to law enforcement to obtain immigration benefits, including deferral of adverse immigration action. CHS has been corroborated by, among other evidence, surveillance video, arrest reports, cellphone evidence and statements by one or more other witnesses.

25

d.      On or about June 12, 2026, a law enforcement officer uninvolved with this investigation administered five separate six-photograph blind arrays to CHS, and CHS made the following identifications:

i.      CHS identified a photograph of JULIAN PACHANO as the individual who spotted the Victim in the park.[10] CHS explained that s/he learned this information because s/he had conversations on or about May 18, 2026 with the individuals who claimed to take part in the kidnapping and murder of the Victim, namely, PACHECO TORRES, MONASTERIO BRICENO, Coconspirator 1, and Coconspirator 2.

ii.     In a different array, CHS identified a photograph of JOSUE PACHECO TORRES as "Popeye."

iii.    In a different array, CHS identified a photograph of KLEIVER MONASTERIO BRICENO as "Goofy."

e.      CHS has personally been inside Unit 1F of the Archer Apartment ("Unit 1F") and knows Unit 1F to be under the control of PACHECO TORRES, a/k/a "Popeye," who leads a set of TDA that operates out of Unit 1F.

f.      On or about May 18, 2026, CHS was present for discussions between and among PACHECO TORRES, a/k/a "Popeye," MONASTERIO BRICENO, a/k/a "Goofy," and others, during which they described how they had carried out the

---

[10] Before making this statement, CHS stated that JULIAN PACHANO had spotted a different person, but then immediately corrected that PACHANO had spotted the Victim. CHS did not know PACHANO's name.

26

kidnapping and murder. Based on these discussions, CHS understood that PACHECO TORRES had ordered the kidnapping and murder because he and other members of TDA believed that the Victim had, on a prior occasion, killed another Venezuelan man.

g.    On or about May 18, 2026, MONASTERIO BRICENO, Coconspirator 1, and Coconspirator 2, each showed one or more cellphone recordings of the Victim's murder, which CHS was able to clearly observe on MONASTERIO BRICENO's phone. CHS could see Coconspirator 1's face clearly in the video, and also believed that Coconspirator 2, MONASTERIO BRICENO, and PACHANO were depicted in the video based on a combination of their clothing and voices in the video. PACHECO TORRES has also shown CHS one or more recordings depicting the murder of the Victim.[11] In these videos, MONASTERIO BRICENO appeared to push the Victim into a bathtub, and Coconspirator 1 appeared to fire a gun into the Victim, who was wearing a red hooded sweatshirt and black pants.[12]

h.    CHS's description of the manner in which the Victim was killed matches the scene that law enforcement encountered inside the Perry Apartment—

---

[11] In an interview with law enforcement on or about June 25, 2026, CHS clarified that although PACHECO TORRES showed CHS a similar video, he did not show CHS the video on his own phone.

[12] In a prior interview with law enforcement, CHS stated, in summary, that both MONASTERIO BRICENO and Coconspirator 1 had fired guns at the Victim. When asked about the discrepancy in the description of the video, CHS clarified that after the prior interview with law enforcement, CHS had another opportunity to review the video shown to CHS by the coconspirators and subsequently believed that Coconspirator 1 was the only person visible in the video shooting the Victim.

that is, the Victim, wearing a red hooded sweatshirt and black pants, kneeled facedown over a bathtub, with gunshot wounds.

### D. Recovery of the Durango and Arrest of MONASTERIO BRICENO

17. Based on my review of law enforcement records, my discussions with other law enforcement officers, my interviews of the witnesses described below, and my involvement with this investigation, I have learned, among other things, the following:

a. On or about May 22, 2026, at 3:39 AM, the Franklin Police Department ("FPD") encountered the Durango in Whiteland, Indiana, after responding to a police dispatch request unrelated to the Victim's kidnapping and murder. A gas station employee reported a theft committed by four males and described the Durango identified during the Victim's kidnapping as the getaway car used by the males. FPD conducted a traffic stop on the Durango after a brief pursuit on Interstate 65 in which the Durango traveled at a very high rate of speed. The driver was Coconspirator 2, and the three passengers were MONASTERIO BRICENO, Coconspirator 1, and a juvenile male ("Juvenile-1"). All four males were arrested for offenses related to the reported theft and vehicle pursuit. According to FPD records, upon MONASTERIO BRICENO's, Coconspirator 1's, and Coconspirator 2's arrest in Whiteland, Indiana, on May 22, 2026, the silver Dodge Durango bearing Illinois license plate GB81159 from which they were apprehended was impounded. Due to the Durango's use during the Victim's kidnapping and murder, CPD arranged for the transfer of the Durango to a CPD facility in Chicago.

28

b.      On or about June 1, 2026, law enforcement officers executed a search warrant obtained in the Circuit Court of Cook County on the Durango for evidence related to the Victim's murder. During that search, law enforcement officers recovered a 9mm Beretta pistol (the "Beretta").

18.     Following the recovery of the Beretta, officers from the Bureau of Alcohol, Tobacco, Firearms, and Explosives test-fired the Beretta and entered the spent cartridge casings into the National Integrated Ballistics Network. Analysis of these spent cartridge cases revealed a ballistic link between the Beretta and the shell casings recovered from the Perry Apartment where the Victim was found.

## II.      CONCLUSION

19.     Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about May 18, 2026, JOSUE PACHECO TORRES, KLEIVER MONASTERIO BRICENO, and JULIAN PACHANO, and others known and unknown, conspired to and did willfully and unlawfully seize, confine, kidnapped, abduct, and carry away the Victim, and otherwise held him for their own purpose and benefit, and in committing and in furtherance of the commission of the offense used a means, facility, and instrumentality of interstate commerce, and that such actions

29

resulted in the Victim's death, in violation of Title 18, United States Code, Sections 1201(a) and (c).

FURTHER AFFIANT SAYETH NOT.

_TFO Kevin Hawkins_

Kevin Hawkins
Task Force Officer
Federal Bureau of Investigation

Sworn to and affirmed by telephone the __ day of June, 2026

_Laura K. McNally_

Honorable Laura K. McNally
United States Magistrate Judge

30